# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

PAMELA R. BAILEY,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

No. C05-4011-MWB

**REPORT AND RECOMMENDATION**

_____

## *TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

     *A.*     *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
     *B.*     *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
         *1.*     *Introductory facts and Bailey's hearing testimony* . . . . . . . . . **3**
         *2.*     *Bailey's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
         *3.*     *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

III.   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . . **23**

     *A.*     *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **23**
     *B.*     *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **26**

IV.   **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

# I. INTRODUCTION

The plaintiff Billi Jo Bailey ("Bailey") appeals a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Bailey claims the ALJ erred in finding she has the mental and physical functional capacity to work, and in failing to obtain the testimony of a vocational expert. (*See* Doc. No. 7)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On June 11, 2002, Bailey filed an application for DI benefits, alleging a disability onset date of November 30, 2001. (R. 45-47) Bailey alleged she was disabled due to "Hepatitis C; Sheehan's Syndrome; Back and tailbone; Hyperpituitary; [and] (L) hand." (R. 51) She claimed her condition limited her ability to work by making her "feel severely fatigued," making her hyper-susceptible to illness; limiting her ability to walk up hills or stairs, or to stoop, bend, or pick up objects; and causing her sleep difficulties. (*Id.*) Her applications were denied initially and on reconsideration. (R. 24, 27, 31-33, 36-69)

Bailey requested a hearing (R. 40), and a hearing was held before ALJ James E. Ross on May 3, 2004, in South Sioux City, Nebraska. (R. 216-39) Bailey was represented at the hearing by non-attorney Lee Sturgeon. Bailey was the only witness at the hearing.

On June 9, 2004, the ALJ ruled Bailey was not entitled to benefits. (R. 11-19) Bailey appealed the ALJ's ruling, and on December 22, 2004, the Appeals Council denied Bailey's request for review (R. 4-6), making the ALJ's decision the final decision of the Commissioner.

Bailey filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate

Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Bailey's claim. Bailey filed a brief supporting her claim on May 27, 2005. (Doc. No. 7) The Commissioner filed a responsive brief on July 8, 2005 (Doc. No. 8) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Bailey's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Bailey's hearing testimony

At the time of the hearing, Bailey was forty-four years old. She was 5'3" tall and weighed 174 pounds. She stated her normal weight before she became disabled was about 115 pounds. She is married and has four children. (R. 219-20)

Bailey is a high school graduate. She completed about three months of training in baking and in business management through her employer, Interbake Foods. Other than working at Interbake, she worked briefly for a temporary agency, and she attempted several jobs but stated she "never seemed to make it through the probation period." (R. 221) For example, she tried working as a motel maid, but she was unable to do the job "due to the excessive bending and getting on [her] knees to do the bathroom floors." (*Id.*) She attempted work as a dishwasher and at a line assembly job, but was unable to do those jobs. (R. 222) She also worked for about a month at a grocery store, separating bottles and cans for recycling. (R. 238) She left the recycling job when she became ill from Sheehan syndrome, passed out at work, and was hospitalized. (R. 238)

Bailey worked at Interbake Foods for sixteen years. She started out on the assembly line packaging cookies, and she had several promotions over the years, including foreman, supervisor, and floor manager. She supervised up to 350 people for several years, did employee evaluations, and made some firing decisions. She stated that even as a floor manager and supervisor, she continued to work on the floor, and she was on her feet and

lifting the whole time. In other words, none of the positions was a desk job. She stated she was required to lift thirty pounds frequently and up to fifty pounds on occasion. The supervisory positions also required her to have some mental acuity. She trained new employees, and helped with various jobs on her shift, which was the graveyard shift. (R. 222-24, 234-35)

Bailey left her job at Interbake after she missed a lot of work due to illness. She had surgery on both feet, and then she "almost died in childbirth." (R. 223) She stated her "pituitary disintegrated," and she "almost hemorrhaged to death" and also got blood clots and infection. (R. 236) She took medication for her condition which worked most of the time, but according to Bailey, whenever she gets the flu, it is much worse than when other people gets it, and she normally has to be hospitalized for the flu. (*Id.*) She stated the company gave her "an ultimatum," and said they would pay her for six months and give her insurance for six months to allow her to find other employment. (R. 223)

As noted previously, Bailey had several work attempts, but she has not worked anywhere since November 30, 2001. (R. 223-24) Since that time, in her opinion, she has been unable to do any of the jobs she performed previously. (R. 224) Bailey explained her inability to work at her previous jobs as follows:

> A lot of them were strenuous and then when I got the Sheehan syndrome I was just sick all the time. Several times I had to be hospitalized because that illness prevents you from doing different jobs as far as chronic fatigue. It's one of the things that I would get. And I'm on medication for the rest of my life for that. And then I developed, with the feet, I had the surgery. I'm also having trouble with my knees and then also with my hands also. And then the, not to mention the back problems, that I have severe back problems right now.

(R. 225)

Bailey stated she saw several doctors from November 2001 until May 2004, including specialists and mental health providers, but her primary treating physician was Richard J. Kipp, D.O. (R. 225-26 *see, e.g.,* R. 116-19)

Bailey stated she takes several pain medications, including Percocet, Trazodone, and Hydrocodone. She stated the medications improve her pain somewhat, but she is always in some degree of pain, even when she is very careful about what she lifts. (R. 226-29) The most she lifts is five pounds or less, such as a small load of laundry or a skillet. Lifting causes her pain in the lower back. She also tried injections in her tailbone and lower back for pain, and according to Bailey, the first injection worked for only two days. She planned to give the injections one more try to see if they would work. (R. 227, 237) She opined she can do one or two small loads of laundry per day, noting the laundry is in her basement, down a flight of stairs. (*Id.*) On her worst days, Bailey stated, her pain is a six or seven on a scale of ten, but normally, if she is careful about her lifting and takes her medications, her pain may be a five on a ten-point scale. (R. 228-29)

Bailey stated she has chronic fatigue due to Sheehan's syndrome. According to Bailey, she takes Synthroid for the condition, "which regulates all your organs in your body, your heart, you know, it slows them down, your liver, your kidneys. It slows everything down if it's not taken, if they don't have the right dosage." (R. 230) She stated doctors had encountered difficulty regulating her Synthroid dosage, and the erroneous levels caused her chronic fatigue and severe back pain. (*Id.*)

Bailey stated she also takes five pills a day and receives weekly injections for hepatitis. (R. 231) She stated having to take so many medications makes her feel anxious and depressed, and she takes the antidepressant Effexor. (R. 231) She stated she feels worthless and guilty about not being able to work. (R. 231-32) She also has memory problems, which adds to her depression. (R. 233) She described feeling "real down"

because she has tried to work at different jobs and has been unable to continue with any of them.  (R. 234)

The ALJ asked Bailey about notes in her medical records indicating she was not taking her Synthroid as prescribed.  Bailey responded that she had been unable to afford the medications, but then she "learned that [she] couldn't afford not to take it," and she had been taking her Synthroid regularly since that time.  (R. 236)

Bailey stated she let her driver's license expire because she does not have a car. Her father gives her rides and she takes the bus.  (R. 237)

## 2.   *Bailey's medical history*

On September 16, 1999, Bailey saw Richard J. Kipp, D.O., complaining of pain in her right shoulder and elbow.  Bailey had fallen down some stairs several days earlier, landing on her elbow and shoulder.  X-rays were negative, and the doctor diagnosed trauma/contusions and abrasions to Bailey's right shoulder and elbow.  He prescribed Darvocet-N 100 and Naprosyn 500 mg.  (R. 118)  Bailey cancelled a follow-up appointment scheduled for September 29, 1999, and failed to appear for an appointment scheduled for October 5, 1999.  (*Id.*)

Bailey saw G.W. Halbur, M.D. on October 21, 1999, complaining of fatigue. Notes indicate Bailey's history was "remarkable for Sheehan's syndrome with panhypopituitarism."[1]  (R. 117)  Bailey reported she was just getting over the flu, but she felt "worn out with her muscles aching."  (*Id.*)  She was taking Prednisone, Synthroid, and

---

[1] "Sheehan's syndrome is a condition that may occur in a woman who has a severe uterine hemorrhage during childbirth.  The resulting severe blood loss causes tissue death in her pituitary gland and leads to hypopituitarism following the birth. . . .  Sheehan's syndrome is very rare now because of wide access to good obstetrical care."  Symptoms may include inability to breast-feed, low blood pressure, hair loss, and fatigue.  www.AllRefer.com, "Sheehan's Syndrome" (01/10/06).  Symptoms of hypopituitarism may include fatigue, weakness, sensitivity to cold, decreased appetite, weight loss, abdominal pain, low blood pressure, headache, visual disturbance, and others. *Id.*, "Hypopituitarism."

Premarin. The doctor diagnosed Bailey with "[v]iral gastroenteritis resolving with secondary dehydration," and sent Bailey to the hospital for I.V. saline. He also increased her Prednisone for several days. (*Id.*)

On October 29, 1999, Bailey stopped by Dr. Halbur's office to request a release to return to work as of November 1, 1999. She stated she felt better but was continuing to belch. The doctor gave Bailey samples of Axid, and directed her to follow up with Dr. Kipp, if necessary. (*Id.*)

Bailey saw Dr. Kipp on March 29, 2000, complaining of "persistent upper respiratory symptoms" for two weeks. (R. 112, 117) She stated she had an intermittent cough, low-grade fever, rhinorrhea, and generally had felt ill. She also reported some problems with dry skin, as well as intermittent loose stools and some vomiting associated with her cough. Dr. Kipp diagnosed a persistent upper respiratory infection, and prescribed Biaxin and Claritin, and Triamcinolone cream for the dry skin. He also obtained several lab studies "to further evaluate her Sheehan's syndrome and polyarthralgias." (R. 112)

Bailey failed to appear for an appointment scheduled for April 12, 2000. She was given a work release for April 14-19, 2000, and was scheduled to return to work on April 20, 2000. (R. 112)

On July 27, 2000, Bailey saw Dr. Kipp, complaining of injuries to her face and one hand after she had passed out and fallen four days earlier. She also complained of difficulty burping, with pressure as though she needed to burp. (R. 112) An x-ray of her left hand "showed an obvious fracture of the 4th metacarpal which appeared to be nondisplaced." (R. 116) A CT scan of Bailey's sinuses showed "[m]ucosal thickening in the ethmoid sinuses and maxillary infundibula narrowing the right meatal complex and occluding the left meatal complex." (R. 114) A CT of her head was negative. (R. 115)

X-rays of her left foot were negative. (R. 113) An echocardiogram of her heart was "[e]ssentially normal" for her age. (R. 76)

Bailey failed to appear for her follow-up exam on August 14, 2000 (R. 112), and she next saw Dr. Kipp on August 28, 2000. The doctor's notes indicate Bailey "was hospitalized in late July and early August with Sheehan's syndrome," after sudden cessation of steroid use. (R. 111) She had become hypoglycemic and hypotensive, leading her to fall and fracture her left hand. In addition to the fracture and Sheehan's syndrome, the doctor's impressions included "[c]hronic steroid use." (*Id.*) He ordered an EGD to assess Bailey's reported dysphagia, and a bone density study "for further evaluation concerning her chronic steroid use." (*Id.*)

Bailey saw Dr. Kipp on September 18, 2000, complaining of nasal congestion and drainage and a cough for the previous five to seven days. She had run out of Prednisone, Premarin, and Synthroid about a week earlier, and had not refilled the medications. Dr. Kipp gave her samples of the medications, and also prescribed Zithromax and Novahistine DH cough syrup. (R. 110)

The next record of any medical treatment for Bailey is a note that her Prednisone prescription was refilled on August 15, 2001. (*Id.*) She cancelled an appointment scheduled for October 16, 2001, and failed to appear for an appointment scheduled for January 9, 2002. (*Id.*)

Bailey saw Dr. Kipp on January 16, 2002, for follow-up. She reported that her husband had been diagnosed with hepatitis C, and testing indicated she also had the disease. Her current medications were Prednisone, Premarin, and Synthroid. Bailey reported she was currently "employed at Motel 6 working in housekeeping," and she expected to get health insurance soon. (R. 109) Bailey also reported she had been in an automobile accident on January 3, 2002, and had injured her shoulders and lower back. Examination showed Bailey's nose, mouth, and throat were congested, and her throat was

mildly inflamed. Her back was tender to palpation over the trapezius muscles bilaterally, with spasm and tenderness to palpation over her lower back. Dr. Kipp diagnosed strain in Bailey's shoulder and low back, Hepatitis C, and a urinary tract infection. He prescribed Biaxin, and referred Bailey to Kevin L. Preston, D.O., a specialist, for management of her hepatitis C. (*Id.*) Bailey's records were faxed to Dr. Preston on January 24, 2002 (R. 109), but it appears Bailey did not actually see Dr. Preston until July 2003. (*See* R. 201-02)

On May 22, 2002, Bailey was admitted to the hospital through the emergency room "in adrenal crisis." (R. 88; *see* R. 85-97, 102-08) She reported having run out of her medications several months earlier, and she had not refilled her medications due to financial concerns. She reported becoming increasingly ill for the previous five to seven days, with nausea, perspiration, and difficulty getting out of bed. Upon examination, her blood sugar was 40, and she was admitted into the ICU. She was treated with IV Solu-Cortef until her blood sugars rose. She was discharged two days later at her request, "in stable and improved condition," on the following medications: Synthroid, Prednisone, Floricef, and Prevacid. (R. 89) She was instructed to follow-up with Dr. Kipp in one week, and notes indicate the doctor would "try to arrange assistance" if Bailey's financial difficulties continued. (*Id.*)

On May 29, 2002, Bailey went to the emergency room after slipping and falling on a wet step. She complained of pain in her back, tailbone, and right hand. X-rays of her hand were negative for fracture, but x-ray of her tailbone showed a possible nondisplaced fracture. She was diagnosed with a "[d]eep coccyx contusion, probable nondisplaced fracture," and "[c]ontusion of dorsum right hand, slight contusion of right wrist." (R. 82) Her wrist was placed in a padded wrap for comfort. She was advised that her tailbone injury could take several weeks to heal, and she was directed to sit on a "pillow or

doughnut," and to take Lortab for pain. She was directed to follow-up with Dr. Kipp as needed. (R. 79-84)

Bailey failed to show up for any scheduled appointments with Dr. Kipp during the next ten months. (*See* R. 109; *see also* R. 101) Included among the appointments she missed was a consultative examination requested by Iowa Disability Determination Services. Bailey had filed a claim for disability benefits alleging a disability onset date of November 2001, on the basis of hepatitis C, Sheehan's syndrome, back pain, and fatigue. A consultative examination was requested because the examiner determined the medical evidence of record "was insufficient for adjudication." (R. 98) Bailey responded by letter that she would attend the exam, but she failed to do so. (*Id.*)

The next time Bailey saw Dr. Kipp was on March 31, 2003, when she returned for re-evaluation. He noted Bailey had not been back to see him since she was hospitalized the previous May "with acute adrenal crisis." (R. 101) Bailey complained of excessive fatigue, stating she was unable to do anything. She stated she was applying for disability and was "in the appeals process." (*Id.*) She was receiving Title XIX insurance. Dr. Kipp diagnosed Bailey with continued Sheehan's syndrome, and "GERD/esophageal stricture." (*Id.*) He scheduled a bone density study due to Bailey's frequent fractures, noting Bailey "went through early menopause with her Sheena's syndrome and most likely has osteoporosis." (*Id.*) He also scheduled testing to evaluate her GERD and esophageal stricture further. (*Id.*) Bailey failed to show up for her next appointment on April 21, 2003. (*Id.*)

Bailey underwent a bone density study on April 17, 2003, performed by Jon Q. Taylor, M.D. Dr. Taylor reached the following findings from the study: "Bone mineral density at two sites is at or one standard deviation below normal in the low normal or high osteopenic range." (R. 100) Bailey failed to appear for a follow-up exam with Dr. Kipp on April 21, 2003. (R. 149)

On June 5, 2003, Bailey underwent a psychodiagnostic mental status exam by Michael P. Baker, Ph.D., upon referral from Disability Determination Services. (R. 120-23)  During the evaluation, Bailey described her daily activities as follows:

> Mrs. Bailey reports that she normally goes to bed between 10 and 11 p.m. with one hour sleep onset.  She has frequent awakenings.  She arises at 7 a.m.  She prepares the children for school.  She usually goes back to sleep and might stay in bed all day until the children come home from school in the late afternoon.  Her daughter has become responsible for cleaning the house, cooking, and caring for the other children, to some degree.  Her husband also does some of the cooking. [Bailey] now feels that she is "hollered at for not cleaning the house, and my daughter complains 'I have to do everything'". [Bailey] spends her day watching TV.  She may shop with her husband and/or daughter.  She sometimes visits her mother.  At times, her extended family gives her a ride because the family does not own a car.  She otherwise has little social activity.

(R. 121-22)

Dr. Baker found Bailey to have poor judgment and insight, poor memory and concentration, and poor attention to questions asked of her.  He noted she was rather unkempt, and she displayed "looseness of association and circumstantiality."  (R. 122)  Bailey described herself as feeling sad, depressed, snappy, unhappy, and having frequent crying spells.  He noted that if Bailey's report of having been a supervisor was accurate, she had "decompensated considerably."  (R. 122)  Dr. Baker concluded Bailey probably should have "a supervisor in handling cash benefits," and he noted Bailey's "ability to remember, understand and carry out instructions requiring maintenance of attention, concentration and pace is extremely limited."  (*Id.*)  He diagnosed Bailey with Major Depressive Disorder, and assessed her Global Assessment of Functioning (GAF) at 35, indicating some impairment in reality testing or communication, or major impairment in

several areas such as work, family relations, and judgment. (*Id.*; *see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. 1994).)

On June 16, 2003, Bailey saw Dr. Kipp complaining of continued pain relating to her coccyx fracture from about six months earlier. She also reported some generalized arthralgias, and stated she had run out of Prednisone, Prempro, and Synthroid. The doctor gave Bailey samples of Prempro, Levoxyl, and Protonix, and a shot of Kenalog. He again noted he planned to arrange for an EGD to evaluate Bailey's GERD. (R. 148)

On July 10, 2003, Claude H. Koons, M.D. reviewed Bailey's file in connection with her application for reconsideration of the denial of disability benefits. He noted Bailey had been sent forms to complete on May 29, 2003, and another set on June 23, 2003, followed by a conversation with Bailey during which she indicated she would complete and return the forms. However, the forms were not returned by Bailey, and Dr. Koons noted that without the forms, there was "no way to wholly assess [Bailey's] allegations, as there [was] no subjective information on which to evaluate the claim." (R. 124) Dr. Koons stated this was "due to the claimant's failure to cooperate." (*Id.*) He also noted the numerous "no shows" indicated in Bailey's medical records. (*Id.*)

On July 17, 2003, David A. Christiansen, Ph.D. reviewed the record and similarly concluded the evidence was insufficient to make a determination regarding Bailey's mental status. Dr. Christiansen found Dr. Baker's assessment of Bailey's GAF and mental status not to be supported by diagnostic information or an assessment of functioning. Dr. Christiansen further noted Bailey had failed to submit "appropriate behavioral reports despite attempts to assist her in doing so." (R. 125; *see* R. 127-39, indicating insufficient evidence to complete a Psychiatric Review Technique form)

Bailey returned to see Dr. Kipp on July 23, 2003, for follow-up. She apparently had undergone an EGD on June 18, 2003, "which revealed mild reflux with multiple superficial ulcerations." (R. 147) The specialist who performed the test recommended

Bailey stop taking all nonsteroidal medications and continue taking proton pump inhibitors. Bailey noted she had gained twenty pounds in the last month, which Dr. Kipp opined was due to her steroid medications. He again referred Bailey to Dr. Kevin Preston for an evaluation of her Hepatitis C. (*Id.*)

Bailey was Dr. Preston for an initial evaluation on July 29, 2003. The doctor noted Interferon treatment could have an ill effect on Bailey's hypopituitarism. He ordered lab tests to determine the level of Bailey's Hepatitis C. (R. 201)

Bailey saw Dr. Preston for follow-up on August 19, 2003. He noted lab tests indicated Bailey had "Hepatitis C, type 1a, with low viral load and preserve synthetic function." (R. 200) He ordered additional lab tests and scheduled a liver biopsy. He discussed with Bailey the potential risks and benefits of Interferon treatment, and she was "enthusiastic about potential treatment." (*Id.*)

Bailey saw Dr. Kipp on August 21, 2003, complaining of generalized achiness for ten days, worse with movement. She stated she was scheduled for a liver biopsy the following week with Dr. Preston. Dr. Kipp ordered numerous lab tests, and scheduled a follow-up in two weeks, when he expected to have the lab results as well as the results of Bailey's liver biopsy. (R. 146)

Bailey saw Dr. Kipp on September 3, 2003, complaining of generalized achiness, and discomfort in her neck, shoulders, and low back. She also noted a spot in her right armpit that was swollen. Dr. Kipp noted Bailey had significantly elevated CPK enzymes. He ordered a repeat CPK and other lab tests, switched Bailey from Darvocet to Ultracet, and scheduled a follow-up exam in two weeks to review the lab tests and watch the mass in her right armpit. (R. 145)

Bailey underwent a needle biopsy of her liver on August 25, 2003. Her diagnosis was "[c]hronic hepatitis with mild activity and mild fibrosis[.]" (R 152) Bailey saw Dr. Preston for follow-up on September 8, 2003, and he noted her biopsy showed "mild

disease." (R. 198) Dr. Preston noted Bailey was "fairly asymptomatic," and he wanted to put off starting Interferon treatment until Bailey was set up to be followed by an endocrinologist during treatment. (*Id.*)

Dr. Kipp saw Bailey for follow-up on September 11, 2003. He noted her screening labs concerning her generalized myalgias/arthralgias were "essentially unremarkable." (R. 144) Bailey continued to complain of back pain, general malaise, and the presence of the mass in her right armpit. Dr. Kipp referred Bailey to an endocrinologist at the University of Nebraska Medical Center in Omaha. In addition, he referred her to Dr. Joseph Morris for evaluation of the right armpit mass. He started Bailey on Vicodin for pain. (*Id.*) Dr. Morris apparently excised the mass on September 25, 2003, and biopsy indicated it was a benign fatty tumor (lipoma). (R. 153)

Bailey returned to see Dr. Kipp on October 10, 2003, for a possible urinary tract infection. The doctor recommended holding off on any treatment for urinary symptoms for the time being, noting Bailey was scheduled to see an endocrinologist on November 4, 2003. (R. 143) Dr. Kipp saw Bailey again on October 22, 2003, for a routine pelvic examination and health maintenance. (R. 141) He Pap smear showed the presence of atypical squamous cells, and the pathologist recommended a repeat Pap smear in six months, and consideration of HPV type testing. (R. 150)

Bailey saw Dr. Kipp on October 29, 2003, for follow-up of her back problems. She reported leg pain at night, problems sleeping due to the pain, inability to bend or stoop, and her knees giving out at times. (R. 140) An x-ray of her lower back "showed some loss of lordosis," but no other abnormalities. (R. 157) Dr. Kipp prescribed two weeks of physical therapy, and continued her on Ultram for pain. (R. 140)

Bailey was seen by Jennifer Larsen, M.D. at the Nebraska Medical Center on November 4, 2003, for evaluation of her hypopituitarism. (R. 204-07) The doctor found Bailey's condition "should not be a contraindication for hepatitis C treatment," but

recommended Bailey continue to be followed with regard to her thyroid function throughout and following her treatment. (R. 205) She also noted the fact that Bailey had hot flashes when she was not taking estrogen could indicate "some functional axis in the pituitary." (*Id.*)

On November 13, 2003, Bailey was seen at Siouxland Mental Health Center for an intake evaluation. (R. 182-84) Wade Kuehl, LISW, diagnosed Bailey with a major depressive disorder, and a current GAF of 50, indicating serious symptoms or serious impairment with social and occupational functioning. (*See* DSM-IV at 32.) She was scheduled for therapy two to four times monthly "to attempt to reduce depression symptoms." (R. 184)

Bailey saw psychiatrist Philip J. Muller, D.O. on November 14, 2003, "for a formal intake." (R. 179; *see* R. 179-81) Dr. Muller increased Bailey's Lexapro to 20 mg. daily, and gave her some samples. He directed Bailey to return in two weeks to see how she was doing with her therapist and the increased Lexapro dosage. (R. 180)

Bailey saw her therapist on November 20, 2003. She reported sleeping most of the day, and then waking up at 2:00 a.m., when she would get up and eat while watching television. She then stayed up until her children were off to school, and then would go back to bed until they returned home. The therapist discussed changing that pattern and increasing Bailey's activity. Bailey "noted feeling down about not being able to work," and the therapist suggested she might volunteer through a church or other organization. The therapist also recommended Bailey increase her social activity. He suggested she might ask her doctor for some type of sleep aid. (R. 177)

Bailey returned to see Dr. Muller on November 26, 2003. She stated she was not doing any better on the increased Lexapro dosage. The doctor gave her samples of Effexor, and reduced the Lexapro. He diagnosed Bailey with Major Depressive Disorder, Recurrent. (R. 178)

Bailey next saw her therapist on December 4, 2003. She reported feeling somewhat better on the Effexor, but continued to report "some troubles." (R. 176) She stated she could not increase her activity as much as she would like due to her physical pain, particularly in her back, and she was frustrated because she lacked insurance and could not get the medical treatment she felt she needed. She continued to struggle with her sleep patterns, and felt depressed about not being able to work. The therapist noted Bailey's mood was depressed, and her mood was severely affected by her health conditions. He scheduled another session with Bailey in one week. (R. 176)

Bailey returned to see Dr. Kipp on December 10, 2003, for follow-up regarding her back pain. Physical therapy had not resolved her symptoms, and she continued to complain of "severe low back discomfort with some radiation into her hips and down to her legs." (R. 192) Her current medications were Effexor, Prednisone, Synthroid, and Premarin. Upon examination, "her back revealed tenderness to palpation over the lumbosacral paravertebral muscles and in the presacral area," without crepitation. (*Id.*) Dr. Kipp ordered an MRI scan of Bailey's lumbosacral spine, and prescribed Vicodin for pain, noting Ultram had failed to resolve Bailey's symptoms. (*Id.*)

Bailey cancelled her counseling session scheduled for December 11, 2003, and underwent an MRI of her lumbar spine on that date. The MRI was normal, showing no evidence of degenerative disc disease or other abnormalities at any level. (R. 175, 191)

Bailey next saw her therapist on December 18, 2003. She again was advised to be more active, and she stated she planned to contact a former employer about part-time work, or to look for some volunteer work she could do. Bailey indicated she was dissatisfied with her current life style and she had low self-worth. She was sleeping a lot and spending most of her time at home. She received samples of Effexor, and a prescription for Trazodone, and a follow-up appointment was scheduled in one week. (R. 173-74)

Bailey returned to see Dr. Preston for follow-up on December 22, 2003. The doctor's notes indicate Bailey's depression was "quite mild," and she had received the go-ahead for Hepatitis C treatment from the endocrinologist. She was started on "therapy with standard PEG intron and ribavirin." (R. 197)

Bailey failed to appear for her counseling session on December 24, 2003. (R. 172) She received medications from Dr. Kipp's office on January 6, 2004, to treat a cold and congestion. (R. 190) She cancelled a scheduled appointment with her therapist on January 7, 2004. (R. 171) She saw her therapist on January 9, 2004, and reported her mother and uncle had passed away during the previous two weeks. She was trying to assist her father. She noted she was sad and grieving, but she was coping, and she indicated strong spiritual beliefs were helping her. Her next appointment was scheduled for two weeks later. (R. 170)

Bailey's Trazodone prescription was refilled on January 22, 2004. (R. 174) She failed to appear for her appointment scheduled for January 23, 2004, but called later in the day to report she had lost bus tokens that had been given to her. (R. 169)

Dr. Kipp saw Bailey for follow-up on January 23, 2004. She stated she was awaiting approval to get her Hepatitis C medications that had been prescribed by Dr. Preston. She noted the medications were expensive and she was seeking assistance to pay for them. Dr. Kipp referred Bailey to a pain clinic for evaluation of her ongoing low back pain. (R. 189)

Bailey cancelled her appointment with Dr. Muller on January 28, 2004. She saw her therapist the next day, and discussed her feelings surrounding her mother's death, her husband's drinking, and her own stressors, including feeling "bored." (R. 167) Bailey agreed to attend some AlAnon meetings. She was scheduled for weekly therapy sessions. (*Id.*)

Bailey was seen by the endocrinologist for follow-up of her hypopituitarism on February 3, 2004. Bailey reported "cold intolerance most of the time"; "some abdominal pain all the time mostly right upper quadrant but sometimes left upper quadrant"; "nausea and occasional vomiting after eating," with last occurrence one month earlier; blurred vision; and sleep difficulties. (R. 204) Bailey admitted that up until a month before this visit, when her Synthroid dosage was increased, she had not been taking her Synthroid regularly as prescribed. However, since that time, she had bought a pillbox and was taking her medications without missing doses. The doctor noted Bailey "recently was found to have osteopenia and recommended to start on calcium and vitamin D[;] however she has not started taking these yet." (*Id.*) The record from this examination appears to be incomplete, with no impressions or treatment plan included, and an incomplete last paragraph on the page. (*See id.*)

Bailey again cancelled her appointment with Dr. Muller, scheduled for February 11, 2004. (R. 166) She saw her therapist on February 12, 2004, and reported her back pain had been bothering her and she was feeling frustrated. She stated she was withdrawn much of the time because whenever she tried to be active, she was in extreme pain. She stated the Effexor helped her feel more motivated, but her physical problems prevented her from acting on her desire to be more active. She also reported feeling uncomfortable around people, and stated she did not go to the AlAnon meeting due to anxiety. (R. 165)

At her next counseling session on February 20, 2004, Bailey stated she had gone to a chiropractor, which had helped her back pain somewhat, but she still had a lot of pain. She was "very stressed about this problem and how she [could] afford to get the treatment she needs." (R. 164) She continued to grieve the loss of her mother and uncle, but stated her faith and spirituality were helpful to her. (*Id.*)

Bailey returned to see Dr. Kipp on February 25, 2004, for a repeat Pap smear, and repeat lab work relating to her Hepatitis C treatment. She reported tolerating her

medications fairly well.  She complained of some exertional chest pain that worsened when she breathed deeply.  A chest x-ray and EKG were normal, and Dr. Kipp opined Bailey's chest pain was "more related to pleuritic type pain than coronary disease."  (R. 185)

Bailey did not appear for her therapy session on February 27, 2004.  She saw Dr. Preston for follow-up of her Hepatitis C treatment on March 15, 2004.  (R. 196)  She reported some reflux symptoms and multiple upper GI tract symptoms, and the doctor ordered an EGD to evaluate these.  Bailey was trying to work out financial issues relating to her treatment, and reported there would be an interruption in her treatment as she switched from Title XIX coverage to some other type of coverage.  Dr. Preston noted, "She will need to let us know when she can restart therapy.  Overall, this is certainly unfortunate, as we know it is important to have continuous, noninterrupted treatment with the combination therapy."  (*Id.*)

Bailey saw Dr. Muller for a medication check on March 17, 2004.  She reported lack of energy, and feeling somewhat depressed.  Dr. Muller increased her Effexor dosage, and scheduled a follow-up exam in six weeks with a new psychiatrist who would be replacing Dr. Muller at the clinic.  In addition, Bailey's prescription for Trazodone was refilled.  (R. 162, 174)

Dr. Preston performed an EGD on Bailey on March 18, 2004.  His impression from the test was "[m]ild distal superficial gastritis of doubtful clinical significant - otherwise negative EGD."  (R. 193)  He continued Bailey on Nexium.  (*Id.*)

On April 27, 2004, Dr. Kipp completed a Treating Medical Source Statement regarding activities he believed Bailey could do "on a regular and continuing basis," meaning eight hours per day, five days a week, or equivalent.  (R. 208)  Dr. Kipp opined Bailey could sit for fifteen to thirty minutes, and then she would have to walk about for a few minutes and change positions.  He estimated she could sit for a total of four hours in an eight-hour work day.  He opined Bailey could stand or walk about for fifteen to thirty

minutes before she would have to sit, lie down, or recline, but he noted sitting at a desk or table would be sufficient rest after standing or walking for half an hour. He estimated Bailey could stand or walk about for a total of four hours in an eight-hour work day. Although Dr. Kipp opined Bailey would have to rest for some period of time during a normal work day to relieve pain arising from her medical impairments, he indicated regular breaks, scheduled at about two-hours intervals, would be sufficient. He estimated Bailey would have to rest lying down or reclining for about one hour in an eight-hour work day. The doctor further opined Bailey could lift and carry up to ten pounds occasionally, balance occasionally, and perform repetitive use of her arms and hands occasionally (*i.e.*, less than one-third of an eight-hour day). He further suggested Bailey could be limited from her depression due to "multiple medical problems," and stated his overall impressions were based on diagnoses of low back pain due to two coccyx fractures, Hepatitis C, and Sheehan's Syndrome. (R. 208-11)

Bailey saw the endocrinologist for follow-up on May 4, 2004. The doctor's impressions were as follows:

> 1. Panhypopituitarism. HPA axis seems to be adequately replaced with total 5 mg daily prednisone. Does not have any fatigue, aches and pains to suggest under replacement.
> 2. Thyroid replacement with Synthroid 150 mcg. She still does miss occasional doses. She has not started replacing the missed doses. She also takes her thyroid hormone with three tablets of calcium at the same time, which might interfere with the absorption. I do not have any recent thyroid function tests.
> 3. Hypogonadism. She is on Premarin and she does not take this one with thyroid hormone.
> 4. Hepatitis C. Started on treatment with pegylated interferon, which improved her symptoms significantly.

(R. 213) The doctor ordered lab tests of Bailey's thyroid function, and advised her not to take her Synthroid with estrogen, iron, or calcium. She was advised to continue taking Vitamin D. The doctor also discussed with Bailey and her daughter the importance of

taking the Synthroid as directed, and Bailey "agreed to get a pillbox and . . . replace the missed doses." (R. 214) She was scheduled to return for follow-up in six months.

### 3.     *The ALJ's decision*

The ALJ found Bailey has not engaged in any substantial gainful activity since her alleged disability onset date.   IR. 14)   He concluded Bailey suffers from severe impairments including "a fractured coccyx in 1982 with complaints of low back pain; history of hepatitis C, mild; and a history of Sheehan's syndrome," but he further concluded her impairments, singly or in combination, do not reach the Listing level of severity. (R. 14-15)  He further concluded Bailey's depression is "considered to be a nonsevere impairment as it has no more than a minimal effect upon [her] ability to function[.]" (R. 15)

The ALJ noted Bailey did not seek treatment for depression until November 2003, and by March 2004, she was reporting doing well on her medications. (R. 16)  The ALJ gave little weight to Dr. Baker's June 2003 opinion that Bailey had an extremely limited ability to remember, understand, and carry out instructions, or maintain attention, concentration, and pace.  The ALJ found Dr. Baker's opinion was "solely based upon a one-time interview with no follow-up, which does not show a longitudinal history." (*Id.*) The ALJ similarly rejected Dr. Baker's GAF rating of 35, noting the rating was "very low when compared to his narrative report or when considering the record in its entirety." (*Id.*)  The ALJ found it significant that at the time Bailey saw Dr. Baker, she "was able to care for her six children,[2] watch television, shop with her husband, and visit with her mother." (*Id.*)  He opined that if Bailey were as severely limited as she claimed, she would have sought medical attention sooner than November 2003.  Further, he noted that even if her symptoms were as severe as she claimed, her symptoms did not last for twelve

---

[2]The court notes Bailey testified she has four children, not six children.  (*See* R. 220)

continuous months, noting she reported to her doctor that her symptoms had resolved within four or five months of beginning treatment. (*Id.*)

The ALJ discounted Bailey's subjective complaints regarding her physical impairments for several reasons. He noted she was noncompliant in completing requested forms, in taking her medications as directed, and in showing up for scheduled appointments with her doctors and therapist. He noted, "Although the record shows that at times [Bailey] was not able to purchase medications due to financial concerns, it appears her treating source was willing to give [her] samples of medicine or make other arrangements to keep her going with medications until she was able to purchase such[.]" (R. 17) The ALJ concluded that Bailey's noncompliance in these areas indicated her symptoms either had improved or were not as severe as reported. (*Id.*)

Considering all the evidence of record, the ALJ found that although Bailey "suffer[s] from some discomfort that limits her from engaging in certain physical activities," she nevertheless "retains the residual functional capacity to perform a light level of exertion; i.e., lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk up to six hours in a workday; and sit up to six hours in a workday with occasional stooping involved." (R. 15) The ALJ found Bailey is incapable of returning to her past relevant work, but other jobs exist that she can perform, applying the Medical-Vocational Guidelines to reach this conclusion. He noted Bailey is considered a younger individual (noting she was 44 years of age at the time of the hearing), and has a high school education and a history of unskilled work. He therefore concluded "Rule 202.20 applies to the evidence and provides a framework that she be found 'not disabled.'" (R. 18)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, ___ F.3d ___, 2006 WL 8474 (8th Cir. Jan. 3, 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## *IV. DISCUSSION*

Bailey argues the record does not contain substantial evidence to support the ALJ's findings and conclusions regarding her mental and physical functional capacity. She claims the ALJ gave insufficient weight to Dr. Kipp's treating source statement and opinions, and erred in discounting Dr. Baker's opinions. She further argues the ALJ erred in relying on the Medical-Vocational Guidelines (Grids), and not the testimony of a Vocational Expert, in finding she is able to work. (*See* Doc. No. 7)

The court finds the ALJ's residual functional capacity assessment is supported by the evidence of record. Throughout Dr. Kipp's treatment notes, he never indicates Bailey has any physical restrictions on her functional abilities. In his checklist regarding Bailey's abilities, the doctor notes Bailey would be able to sit for four hours in an eight-hour day, and stand or walk for four hours in an eight-hour day. He further indicates sitting at a desk would provide adequate rest from standing/walking activities. When read with the remainder of the record, Dr. Kipp's opinion of Bailey's abilities supports a conclusion that she would be able to work. Thus, the court finds the ALJ gave proper weight to Dr. Kipp's opinion in making a determination of Bailey's residual functional capacity. *See Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005) (although ALJ considers medical source opinions in assessing RFC, the final RFC determination is for the Commissioner).

This raises the question of whether the ALJ erred in failing to obtain the testimony of a Vocational Expert to determine whether jobs exist in sufficient numbers that Bailey can perform. The ALJ found Bailey had little or no nonexertional impairments that would limit her ability to perform work identified by the regulations. "Nonexertional limitations are those that affect a claimant's 'ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing, or pulling. . . .'" *Burnside v. Apfel*, 223 F.3d 840, 844 (8th Cir. 2000) (citing 20 C.F.R. §§ 404.1569a(a), 416.969a(a)). In finding Bailey has no significant nonexertional limitations, the ALJ discounted Dr. Baker's opinion that Bailey would be significantly limited in her ability to remember, understand, and carry out instructions, or maintain attention, concentration, and pace. The court agrees the record contains substantial evidence that contradicts Dr. Baker's conclusions. Although the evidence indicates Bailey suffers from depression, it appears her lack of activity is a significant factor in her depression. It also appears her depression is well controlled by medication, and if depression has limited her ability to work at all, it did so only for a few months.

Having determined Bailey's ability to work is not limited by a nonexertional impairment, the ALJ properly applied Grid Rule 202.20 in making his determination that Bailey is not disabled. "Use of the Guidelines is appropriate if the ALJ explicitly discredits subjective complaints of pain [and other limitations] for a legally sufficient reason." *Carlock v. Sullivan*, 902 F.2d 1341, 1343 (8th Cir. 1990). The court finds the ALJ appropriately applied the Grid Rule in determining that Bailey is not disabled. *See Hunt v. Heckler*, 748 F.2d 478, 480 (8th Cir. 1984).

## V. *CONCLUSION*

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C), Federal Rule of Civil Procedure 72(b), and Local Rule 72.2, within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 23rd day of January, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).